Gregory K. Nelson, Esq. CSB 203029
*email: nelson@weeksnelson.com*
WEEKS NELSON
16236 San Dieguito Road, Suite 5-20
P.O. Box 675963
Rancho Santa Fe, CA 92067
Telephone:  (858) 794-2140

Attorney for Plaintiff David (Dovid) Schick

UNITED STATED DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAVID (DOVID) SCHICK**, an individual,<br><br>         Plaintiff,<br><br>   vs.<br><br>**NANO-X IMAGING LTD.**, an Israeli corporation, **NANOX IMAGING PLC.**, a Gibraltar corporation, **NANO-X IMAGING, INC.**, a Delaware corporation, **RAN POLIAKINE** and **DOES 1-10**,<br><br>       Defendants. | Case No.:<br><br>**COMPLAINT FOR**:<br><br>1. BREACH OF CONTRACT<br>2. CONVERSION<br>3. COMMON COUNTS<br>4. FRAUD<br>5. NEGLIGENT MISREPRESENTATION<br>6. INTENTIONAL MISREPRESENTATION<br>7. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING<br><br><br>**DEMAND FOR JURY TRIAL** |

Complaint

1

Plaintiff David (Dovid) Schick ("Schick" or "Plaintiff") hereby complains against Defendants Nano-X Imaging Ltd., Nanox Imaging PLC, Nano-x Imaging, Inc., (collectively "Nanox"), Ran Poliakine ("Poliakine") (Nanox and Poliakine collectively "Defendants"), and Does 1 through 10, as follows:

## INTRODUCTION

1.     This case arises out of a company's failure to fulfill its contractual obligations after benefiting from an industry expert's efforts, time and service to give that company a path to significant value. The Plaintiff, Schick, is an entrepreneur and industry leader in X-rays. At the behest of the Defendants, he took a position with the company as its Chief Technology Officer and led the company to develop technology for an industrial use of which the company was not aware. Because of these efforts, the company was able to go public on the NASDAQ, making its owners and officers a substantial amount of money. After paving this path to success for the company, the company forgot about the Plaintiff and failed to pay him what he was owed. In fact, Plaintiff believes that this inducement was actually fraudulent and that the company had no intention of paying him the substantial amount of money he is owed.

## THE PARTIES

2.     Plaintiff David (Dovid) Schick is and was at all times mentioned herein, a resident of the State of California, with a residence within the County of Los Angeles. Schick was hired as a consultant by the Defendants.

3.     Plaintiff is informed and believes, and thereupon alleges, that defendant Nano-X Imaging Ltd. is an Israeli corporation registered on the NASDAQ. Plaintiff is further informed and believes, and thereupon alleges, that defendant Nano-X Imaging Ltd. is the successor in interest to Nanox Imaging Plc.

Complaint

Plaintiff is informed and believes, and thereupon alleges, that since its inception, defendant Nano-X Imaging Ltd. has been continuing to do business systematically in California.

4.     Plaintiff is informed and believes and thereupon alleges that Nano-X Imaging Ltd. is the successor-in-interest to Nanox Imaging Plc., and therefore liable for the obligations of Nanox Imaging Plc., as set forth herein.  In the Form F-1 and other SEC filings by Nano-X Imaging Ltd., it describes Nanox Imaging Plc. as its "predecessor." The Nanox entities entered into an Asset Purchase Agreement on or about September 3, 2019, and amended as of December 3, 2019 ("APA"). Pursuant to that agreement, consideration was to be paid to Nanox Imaging Plc. upon, among other things, an initial public offering, payable in either cash or equity.

5.     Schick is informed and believes, and thereupon alleges that Nano-X Imaging Ltd. has an express or implied agreement of assumption of the obligations of Nanox Imaging Plc.  Schick is further informed and believes, thereupon alleges, that the APA really amounts to a consolidation or merger of the two corporations. Additionally, Schick is informed and believes, and thereupon alleges, that Nano-X Imaging Ltd. is a mere continuation of Nanox Imaging Plc. because, among other things, the companies describe Nanox Imaging Plc. as the predecessor entity, multiple persons were officers, directors, or stockholder of both corporations, and there does not appear to have been adequate consideration for the transaction at the time of the transaction. The shareholders of both companies appear to have been the same at the time of the transaction.  On the signature page of the purchase agreement, Ran Poliakine signs as CEO of both the seller and the purchaser.  In addition, at least Hitoshi Matsuya remained head of the Japanese research operations, and it is believed that other officers, directors and management remained the same. Further, the board of directors of each company pre- and post-transaction are essentially the same. Finally, per the payment arrangement described

Complaint

in the APA, Nano-X Imaging Ltd. did not pay anything at the time of the transaction, even though it received assets plus $7.1M in cash from Nanox Imaging Plc. Plaintiff contends that the two entities are one and the same for all intents and purposes.

6.     Plaintiff is informed and believes, and thereupon alleges, that defendant Nanox Imaging Plc. is or was a corporation formed under the laws of Gibraltar and doing business in Israel and California, among other locations. Plaintiff is informed and believes, and thereupon alleges, that since at least 2014 and continuing through the present, defendant Nanox Imaging Plc. and its successor in interest did and have been continuing to do business systematically in California.

7.     Plaintiff is informed and believes, and thereupon alleged, that defendant Nanox Imaging, Inc. is a corporation formed under the laws of the State of Delaware and doing business throughout the United States including in California and this district, continuously and systematically. Plaintiff is informed and believes, and thereupon alleges, that defendant Nanox Imaging, Inc. is the operating arm and/or U.S. subsidiary of defendant Nano-X Imaging Ltd.

8.     Defendant Ran Poliakine is an individual citizen and resident of Israel. Poliakine regularly travels to and conducts business in California. Poliakine's actions were directed at and engaged Schick in California.

9.     Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise of the defendants sued herein as DOES 1 through 10, inclusive, and therefore sues them by those fictitious names. Plaintiff is informed and believes that each of these defendants was in some manner responsible for the events and happenings alleged in this complaint and for Plaintiff's injuries and damages. Plaintiff is informed and believes that some or all of defendants DOES 1 through 10 are residents of the State of California.

Complaint

10.     Plaintiff is informed and believes and thereon alleges that each of the Defendants named herein as DOES 1 through 10, inclusive is intentionally or negligently responsible, or is otherwise legally responsible, in some manner, either vicariously or by virtue of his, her, or its own conduct, negligence or failure to act, or for the conduct, negligence or failure to act on the part of his, her, or its agents, servants or employees, for the acts and occurrences herein referred to, and has proximately caused injury and damages thereby to Plaintiff as result of their conduct hereinafter described.

11.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, the Defendants and the Defendants DOES 1 through10, and each of them, were the agents, partners, joint venturers and/or or employees of their co-defendants, and in doing the things herein alleged, were acting within the scope of said agency, partnership, join venture and/or employment with the advance knowledge, acquiescence or subsequent ratification of their co-defendants.

## JURISDICTION

12.     Jurisdiction over this action is founded upon 28 U.S.C. § 1332. The parties in this action are diverse from each other and the sum in controversy exceeds the amount of $75,000.

## VENUE

**13.**     Venue is appropriate in this Court because, as alleged in this complaint, the Defendants engaged and continue to engage Schick to do business in Los Angeles County, California, the asserted contract was entered into and performed in Los Angeles County, California, the obligations, breaches and liabilities occurred in Los Angeles County, and the Defendants continue to do business in Los Angeles County, California. Poliakine, in his individual capacity and as the officer and agent of the Nanox defendants, made false statements to induce the Plaintiff in California.

Complaint

## BACKGROUND

14.   Plaintiff Schick is an electrical engineer, inventor, entrepreneur and executive. He has approximately 100 U.S. and foreign patents and patent applications pending. He graduated in 1985 from the University of Pennsylvania with a bachelor's degree in electrical engineering, worked as an electrical engineer for a few years and then founded Schick Technologies, Inc. ("STI") in New York, which developed novel computer dental radiography technology used by more than half of the dentists in the developed world.

15.   Mr. Schick served as CEO of STI from its founding in 1992 through 2004, taking it public on the NASDAQ in 1997.  Schick and STI went on to develop digital imaging systems for other radiography modalities, including bone densitometry, panoramic imaging, tomography, and mammography. Schick's digital imaging system is still the leading instant imaging system in the dental industry, and Mr. Schick is widely regarded as one of the founding pioneers of modern radiography in medicine and dentistry.

16.   In 2014, Schick was approached by the founder and CEO of Nanox Imaging Plc., Ran Poliakine, who sought to hire Schick to develop technology for the start-up company. In January 2014, Schick was on vacation in Israel and a friend, Richard Stone, asked Schick to meet with Poliakine and advise him on a technology project called Nanox. Thus began the relationship with Nanox/Nano-X and Ran Poliakine.

17.   On or about January 5, 2014, Schick met Poliakine at his offices in Israel, where he also met with Hitoshi Masuya and Morry Blumfield. At that meeting, Masuya presented the Nanox technology, which was an array of microscopic structures that could be made to emit electronics. The device was called a Field Effect Device ("FED") and was comprised of existing technology that Nanox was attempting to repurpose for other applications. Matsuya presented three possible applications: low-light digital image detectors, dental x-ray detectors, and

x-ray emitters, all of which Schick was very familiar with. Based on his experience, Schick explained to the group why the only viable use would be with x-ray imaging, as well as the economic dynamics of the medical imaging marketing.

18.   The Nanox group was impressed and met with Schick again on January 9, 2014. At that time, Poliakine described several other companies he was involved in, and whether Schick might be interested in consulting and advising on all the companies, including Nanox.

19.   On or about January 28, 2014, Schick wrote to Poliakine and expressed that he felt he would be more effective focusing on only one venture – Nanox.

20.   In February 2014, Schick and Poliakine met in New York to discuss how to best work together. On February 28, 2014, Poliakine wrote to Schick and proposed making Schick the interim CEO of Nanox, and later chairman of the company. He also invited Schick to travel to Japan, meet the team there, and work on development.

21.   On or about March 9, 2014, Poliakine sent an email to Schick which forwarded an email from Masuya Hitoshi with the subject line: "RE: Tests at GE." The intent of the email, sent during the inducement and solicitation of Schick by Poliakine to work for Nanox Imaging Plc., was to impress on Schick that Nanox Imaging Plc. had great technological success and was being seriously considered by GE Medical. For example, the email read, in part: "GEGR team also got excited by our team's successful start of the testing. . . . aren't we a good team who is moving the big company pushing them from every angle in concert." The impression of the email was the GE Medical was partnering with or at least seriously working with Nanox Imaging Plc.

22.    Schick is informed and believes, and thereupon alleges, that in fact GE Medical was not partnering with or seriously working with Nanox Imaging Plc. Instead, GE Medical was simply allowing Nanox Imaging Plc.to run some tests at their facility.

23.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that there was no serious business relationship with GE Medical at the time he sent the March 9, 2014 email to Schick.

24.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that serious business opportunities and advantages was an important consideration for Schick in determining to work for Nanox Imaging Plc. Schick is informed and believes, and thereupon alleges, that Poliakine nevertheless sent this email to create the false impression of the relationship with GE Medical, while concealing the truth that there was no real relationship or partnership with GE Medical. Schick did in fact rely on Poliakine's March 9, 2014 representations in determining to work with Nanox Imaging Plc.

25.   On or about March 17, 2014, Poliakine sent another email to Schick as part of inducing Schick to work with Nanox Imaging Plc. Among other things, Poliakine wrote: "As noted previously, I have spoken with Richard, Ariel and Moshe and everyone is very excited about having you on board. . . . FYI good news is that we have managed to secure $5M in funding."

26.   Schick is informed and believes, and thereupon alleges, that by March 17, 2014, Nanox Imaging Plc. had not in fact secured $5,000,000 in funding.

27.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that Nanox Imaging Plc. had not secured $5,000,000 in funding when he sent the email on March 17, 2014 to Schick.

28.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that funding for Nanox Imaging Plc. was an important and material consideration for Schick in his determining to work with the company. Schick is informed and believes, and thereupon alleges, that Poliakine nevertheless made this false representation with the intent to cause Schick to rely on this information and induce Schick to work for Nanox Imaging Plc. Schick did in fact rely on Poliakine's March 17, 2014 representation.

29.    On April 6, 2014, Poliakine wrote "I really enjoyed our time together and I am more enthusiastic than ever to move forward and conclude things. I am excited at the prospect of working together, while turning an innovative technology into a billion dollar business and having fun along the way while creating value for all."

30.    On April 7, 2014, Schick responded to express his agreement to work for Nanox Imaging Plc. on a short-term engagement.

31.    On April 20, 2014, Schick wrote to Poliakine and provided a draft consulting agreement that anticipated working for approximately 60 days to come up with a target application for the FED technology. Then, if at the end of that time it made sense to both sides, Schick would consider becoming the CEO of Nanox Imaging Plc.

32.    On April 24, 2014, Poliakine responded and invited Schick to visit with the board in Israel. Schick's corporate and inventive experience was viewed by Poliakine as a significant contribution to the company.

33.    On May 23, 2014, Nanox Imaging Plc.'s attorney – Mirit Leon Mendelovich – wrote to Schick and presented the terms of a consulting agreement: "I'd like to confirm the terms that we agreed with regards to your consulting service for Nanox: The term of the engagement will be 3 months commencing May 22, 2014. Your monthly fee will be $30,000, payable 15 days from receipt of an invoice. You will also charge the cost of additional resources as detailed in the attached plan (physicist and radiologist). Both should sign confidentiality and assignment of invention agreements. You will be reimbursed for reasonable expenses. Expenses exceeding $500 should be pre-approved. You will receive 17,123 warrants to purchase ordinary shares of the Company at $1.92 per share for a period of 7 years. Please confirm and I will prepare and agreement including confidentiality and assignment of inventions."

Complaint

34.     This agreement was formalized and the company hired Schick as a consultant on May 22, 2014, with the anticipation that he would work for the company for a period of three (3) months ("2014 Agreement"). His work was to (a) find a high-value market application for the Flat Panel X-Ray Source (FPXS), (b) find a lower cost manufacturing solution for the FPXS, (c) file provisional patents on novel implementations, and (d) develop a plan of action for the company, in addition to several other responsibilities. In other words, Schick was a critical part of the team to develop the company and a business for the company. A true and correct copy of the 2014 Agreement is attached hereto and incorporated by reference as Exhibit A.

35.     As agreed, for his services, Schick was to be paid $30,000 per month plus all expenses. Further, Schick was to receive warrants to purchase 17,123 Ordinary Shares of the company, at an exercise price of US$1.60 per share.

36.     At the time of entering into the 2014 Agreement, Schick was located in Los Angeles, California, and the company was located in Israel. Schick signed the agreement in Los Angeles.

37.     Nanox Imaging Plc. quickly learned that Schick's services were invaluable and would be needed on an ongoing basis. Schick and the company began negotiating a long-term agreement. Nanox Imaging Plc. paid Schick a total of $90,000 as compensation, pending the negotiation of a long-term contract.

38.     Initially, Schick and the company began working on an Addendum to his consulting agreement. It was proposed that Schick would take the position as Executive Chairman of the company, and he would receive more stock. On October 26, 2014, as attorney of the company, Mendelovich presented Schick with a draft amendment including this language: "Additionally, the Consultant shall be entitled to receive a warrant to purchase 952,620 Ordinary Shares of the Company of US$0.01, at an exercise price of US$1.60 per share (the "Second Warrant"). The Second Warrant shall be exercisable for 7 (seven) years, and shall vest in 12

(twelve) equal parts of 79,385 shares quarterly; the first portion shall be exercisable on November 21, 2014. All other terms of the Warrant shall be as provided in the Warrant document, attached to this Addendum as **Annex B**."

39.     Schick responded on November 4, 2014, to confirm that the warrants would represent 5% of the total stock of the company. Mendelovich responded on November 9, 2014, with an updated agreement that stated that the company would grant Schick the "warrant to purchase 964,634 Ordinary Shares of the Company of US$0.01, reflecting 5% of the shares of the Company on a diluted bases at the date of this Addendum, at an exercise price of US$1.60 per share (the "Second Warrant"). The Second Warrant shall be exercisable for 7 (seven) years, and shall vest in 12 (twelve) parts, the first one of 80,388 shares, and the rest of 80,386 shares."

40.     Discussions continued and, eventually, rather than an addendum, a new consulting agreement was drafted for Schick's services. Schick was to receive phantom shares, rather than warrants, to assist the company.  The parties eventually entered into a June 1, 2015 consulting agreement between Nanox Imaging Plc. and Schick ("2015 Agreement"). A true and correct copy of the 2015 Agreement is attached hereto and incorporated by reference as Exhibit B.

41.     In negotiating the 2015 Agreement, Nanox Imaging Plc. used multiple attorneys to draft the agreement, both in-house and outside counsel. Schick did not have an attorney to assist in reviewing and drafting the agreement. Rather, he provided some general input to Nanox Imaging Plc.'s attorneys. Prior to entering into the 2015 Agreement, Nanox's attorney, Michal Bineth Horowitz, sent the final draft to Schick for review. In his email on August 19, 2015, Horowitz stated: "Please find enclosed the consulting agreement after Mark's [another attorney for Nanox] comments (responding to your last draft). Benjy has calculated the number of shares constituting 5% as of May 1, 2014 and we inserted the number into the

agreement. Please let us know if this draft is acceptable. I will send the final draft to review and approval of Nanox management before execution. Thanks Michal"

42.     This email falsely created the impression to Schick that it reflected the substantially similar terms as had been previously discussed. However, the 2015 Agreement actually included new language that had never been presented to Schick previously, including this language: ". . . and provided further that the Liquidity event occurred before the Termination Date or during the 24 month period following the Termination Date. If a Liquidity Event occurs at a time which is more than 24 months after the Termination Date no Bonus Amount will be due to the Consultant." Had Schick had an attorney or had his attention been drawn to this new language, he would not have agreed to this language, as it could potentially undo the work he had already done and the value of the work he would yet do. Based on Nanox Imaging Plc.'s attorneys' misrepresentation, Schick approved the 2015 Agreement.

43.     At the time of entering into the 2015 Agreement, Schick was still located in Los Angeles, California, and the company was still located in Israel. Schick signed the 2015 Agreement from Los Angeles, California. In addition to Schick, the company had hired and engaged two other consultants in the Los Angeles area, who worked with Schick.

44.     Schick was again to provide various services for the company under the 2015 Agreement. Specifically, Schick was engaged as the company's Chief Technology Officer ("CTO") and a member of its Executive Committee. His duties include:

- Oversee all technical activities of the Company in Japan and the US.
- Take an active role in the Company's technology development in the US.
- Take an active role in the Company's business development.
- Work with management to develop the Company's strategic and work plans.

- Advise the Board on key technological business issues directly affecting the Company.
- Provide support for the Company's financing activities and investor relations.
- Function on the Executive Committee as an executive arm of the Board, to engage in the development and active guidance of the strategic, business development and product roadmaps for the next step of Nanox's growth, approve routine expenses and regularly report to the Board and operate under its direction.

45.     Schick's provision of the services was anticipated to be part-time throughout the term of the 2015 Agreement, devoting the time and effort reasonably necessary for the services. (Section 1.2) Schick provided those services and has continued to be willing and available to provide such services.

46.     The 2015 Agreement states that the "engagement of the Consultant by the Company will commence on the Effective Date and will continue until terminated by either party. Each party shall be entitled to terminate this Agreement without cause by providing the other party 30 days prior written notice of termination." (Section 2.1)

47.     Neither Schick nor Nanox Imaging Plc., or its successor in interest, Nano-X Imaging Ltd., have ever given written notice of termination of the 2015 Agreement.

48.     Defendants know how to terminate an agreement. For example, as stated in the 2015 Agreement, "the Company and the Consultant previously entered into a consulting agreement dated 28 May 2014 … and the parties now wish to mutually terminate the May 2014 Agreement and enter into a new agreement pursuant to which Consultant will serve, as of the Effective Date, as a consultant of the Company." But neither Nanox Imaging Plc. nor Nano-X Imaging Ltd. ever attempted to terminate the 2015 Agreement.

49.     For his services, Schick was to receive payment of $15,000 per month per the terms of the 2015 Agreement.

50.     In 2016, Poliakine asked Schick to "temporarily" delay monthly payments because Nanox was having financial difficulty and this might give the company time to get its finances in order. On or about March 20, 2016, Poliakine sent an email to Schick with the subject "a couple of things." That email reads in part: "At some point I think you had mentioned that you want to put your Nanox payments on hold for a while given the financial situation. I don't know if that is something you want to implement or was just a thought. I am only asking because accounting reached out to me and I need to know if I need to take any action."

51.     In the days and weeks thereafter, Poliakine and Schick had multiple discussions in which Poliakine represented that the deferral of payment would be until the company had better financing funding, at which point Schick would be paid all money that was deferred. Poliakine and Schick also discussed that Schick would continue to work in the same position with the same responsibilities while the money is deferred.

52.     Schick is informed and believes, and thereupon alleges, that by March and April 2016, Poliakine did not in fact intend to simply defer payment to Schick but in fact hoped to have his services and not have to pay for those services. Further, Schick is informed and believes, and thereupon alleges, that on or around March 20, 2016, accounting had not reached out to Poliakine to solicit a deferral by Schick but instead Poliakine acted unilaterally to secure Schick's deferred payment plan.

53.     Schick is informed and believes, and thereupon alleges, that Poliakine was aware that Schick was respectful and sensitive of the financial condition of the company. Schick is informed and believes, and thereupon alleges that Poliakine misrepresented the request from accounting and concealed his intention to obtain free services and not pay the deferred compensation to Schick.

Complaint

54.     Schick is informed and believes, and thereupon alleges, that Poliakine was aware that the representation that the payment was only deferred and would be repaid was a material consideration for Schick. Schick is further informed and believes, and thereupon alleges, that Poliakine was aware that Schick desired to help the finance team if possible. Schick is informed and believes, and thereupon alleges, that Poliakine nevertheless made these false representations, namely, the intent to defer rather than not pay the compensation and the request by accounting, with the intent to cause Schick to rely on this information and induce Schick to defer compensation which continuing to perform services for the company.

55.     Schick did in fact rely on Poliakine's March 2016 representations. Relying on Poliakine's representations, Schick continued to serve in the same role as a consultant to the company, believing payments were delayed until the company was on better financial footing.

56.     Schick was not aware of the misrepresentation and Poliakine's deception until after Nano-X Imaging, Ltd. went public. By that point in time, Nano-X Imaging, Ltd. and/or Nano-X Imaging, Inc., as successor to Nanox Imaging Plc., had sufficient financing to pay Schick but failed to pay him his deferred compensation and other bonus compensation.

57.     The volume of work for Nanox decreased over time, but Schick has remained available as a high-level technical and business resource to both Nanox entities. Indeed, Schick has provided input to at least one board member on a periodic basis between 2017 and 2020. Nanox has also evidenced its intent to continue the relationship by not terminating the 2015 Agreement but instead continuing to have Schick available to the company through the present as a resource. There has been no change in Schick's consulting duties, position or responsibilities. Indeed, Schick has continued to be the company's CTO through at least September 2019.

Complaint

58.    Further, the 2015 Agreement also contained a non-competition provision: "The Consultant undertakes not to engage, directly or indirectly, during the term of the Agreement and for a further period of 12 months thereafter, for whatsoever reason, in any country, in any business, position, employment or other engagement whatsoever, in any competing business." (Section 4.8)

59.    Schick has continued to be bound by and comply with his obligations under Section 4.8 of the 2015 Agreement.

60.    Nanox Imaging Plc. delayed monthly consulting fees to Schick in the amount of $15,000 per month, beginning in April 2016 through the present. Accordingly, Defendants owe Schick the total sum of at least $1,035,000 in consulting fees, plus interest at the legally authorized rate.

61.    Additionally, Schick was to receive a "One-Time Bonus" set forth in Annex B of the 2015 Agreement. This bonus was intended to compensate Schick, an expert and pioneer in the field, for his time and service, which could not adequately be compensated with the monthly salary. The One-Time Bonus of Annex B was to compensate Schick with 883,620 Ordinary Shares of the company, which constituted 5% of the company's outstanding share capital. The shares were to vest 25% as of May 1, 2014, and then in additional amounts of 6.25% each 3-months of service, beginning on August 1, 2015. Vesting would escalate to 100% if a Liquidity Event occurred.

62.    The One-Time Bonus was to be paid to Schick if (i) Nanox Imaging Plc., or its successor, consummated an initial public offering, (ii) the shareholders received cash proceeds from the sale of all or substantially all of the assets of the company and/or licensing of all or substantially all of the technology and intellectual property rights, (iii) the shareholders receive cash proceeds for sale of all or substantially all of the outstanding share capital of the company, or (iv) the shareholder received a cash dividend or equivalent exceeding $500,000.

Complaint

63.     Schick provided substantial assistance to the company. Among his contributions to the Nanox project, perhaps the most demonstrably significant is his conception of the stationary gantry tomography machine.  This technology is the core of the company's value, and it is what enabled them to complete their IPO in 2020. When Schick joined Nanox in May 2014, the company did not have a concept of how their technology could be productively used in medical imaging – or for just about anything.  Schick immediately recognized that the FED technology could enable a multi-source x-ray machine, which could produce a three dimensional image without any moving parts.  This would make the machines much smaller and lighter, and (potentially) less expensive that the rotating tube CT machines that were on the market.  The technology  could also be used for rapid imaging (such as cardiac CT, which required several scans per second), and for multi-spectral three dimensional imaging (which could potentially do high resolution soft tissue imaging that is only possible with MRI).  In early July 2014, Schick presented a preliminary report, which suggested several applications for the Nanox technology, and analyzed the benefits and challenges of each one.  Among these was the stationary multi-source tomography machine.  (See images below) Schick also provided an analysis of the FED requirements for achieving this design, as well as a comparison with other attempts to do this by other companies.

 

Slide from July 2014 presentation to Nanox BOD          Photo of "Nanox Arc" Stationary CT Machine

Complaint

64.     Schick is informed and believes, and thereupon alleges, that Nanox Imaging Plc. was converted to Nano-X Imaging Ltd. on or about September 3, 2019. Schick is informed and believes, and thereupon alleges that Nano-X Imaging Ltd. is the successor-in-interest to the rights and obligations of Nanox Imaging Plc. under the 2015 Agreement.

65.     Schick is informed and believes, and thereupon alleges, that Nano-X Imaging Ltd. went public on the NASDAQ on or about August 20, 2020.

66.     Pursuant to the 2015 Agreement, Schick is entitled to compensation in an IPO Liquidity Event equal to the average closing price per share of the company's Ordinary Shares during the 30-day period following the effective date of the IPO, minus $0.01 USD per share.

67.     The average price per share of the NNOX stock from August 21, 2020 to September 18, 2020 was $33.3575.

68.     Based on Nano-X Imaging Ltd.'s IPO, Schick is entitled to $29,475,354, less $8,836.20, or a total of $29,466,517.80.  Nano-X Imaging Ltd. has not paid this sum to Schick.

## FIRST CAUSE OF ACTION

### (Breach of Contract against All Defendants)

69.     Plaintiffs incorporate Paragraphs 1 through 68, inclusive, of this Complaint, as though fully set forth herein.

70.     This is a cause of action for breach of contract against Nanox Imaging Plc., Nano-X Imaging Ltd., Nano-x Imaging, Inc.

71.     Schick and Nanox Imaging Plc. entered into the 2015 Agreement on or about June 1, 2015, a true correct copy of which is attached as Exhibit B.

72.     Nano-X Imaging Ltd. and/or Nano-X Imaging, Inc. are the successor(s) in interest to Nanox Imaging Plc.'s obligations under the 2015 Agreement.

Complaint

73.     Schick has performed and/or been available to perform all his services under the 2015 Agreement.

74.     Neither Schick nor Nanox Imaging Plc., or its successor in interest, Nano-X Imaging Ltd., have ever given written notice of termination of the 2015 Agreement.

75.     Schick did all, or substantially all of the significant things that the 2015 Agreement required him to do, or he was excused from having to complete those things.

76.     For his services, per the terms of the 2015 Agreement, Schick was to receive payment of $15,000 per month until termination of the 2015 Agreement. Nanox Imaging Plc. made this payment to Schick from approximately August 2015 through March 2016.

77.     On or about March 20, 2106, Nanox Imaging Plc., by and through its CEO, Poliakine, asked Schick to delay receipt of payment until such time as the company had more financial resources available to it. Schick is informed and believes, and thereupon alleges, that the Nanox entities had better financial footing to pay him on or about August 2020.

78.     Beginning in about April 2016 and continuing through the present, neither Nanox Imaging Plc. nor Nano-X Imaging Ltd. has paid Schick his deferred monthly compensation. Each month where non-payment has been made and deferred payment has not been made constitutes a new and separate breach of the installment payments anticipated by the 2015 Agreement. Schick has not been informed of the funding of the company and has remained ignorant of this information and intended timing of his repayment, except by way of public notification or events. Poliakine and the Defendants have had the information available to them, but not shared it with Schick. Schick has therefore continued to rely upon Defendants for information related to his repayment.

Complaint

79.     This deferred compensation equals in excess of $900,000 in consulting fees, plus interest. The Defendants have breached their obligations by failing to pay these fees to Schick.

80.     Additionally, Schick was to receive a One-Time Bonus set forth in Annex B of the 2015 Agreement equal to 883,620 Ordinary Shares of the company, subject to the vesting schedule.  Schick's vesting would have fully vested by this time, based on the company's IPO.

81.     Pursuant to the 2015 Agreement, Schick was to receive the Bonus upon the sale of the assets of the company or an IPO, among other things.

82.     Based on the IPO, which occurred on or about August 20, 2020, Schick should have received $29,466,517.80 from Nano-X Imaging Ltd. Neither company has paid Schick, thus breaching their obligations.

83.     As a direct and proximate result of the Defendants' breaches, Schick has been injured in at least the amounts set forth above, subject to further evidence at trial.


## SECOND CAUSE OF ACTION
### (Conversion)

84.     The allegations of paragraphs 1 through 83, inclusive, are repled and realleged as though fully set forth herein.

85.     This is a cause of action for conversion against the Nanox Defendants.

86.     Schick provided the Defendants with his services, for which he was to be compensated in the amount of $15,000 per month and with a One-Time Bonus.

87.     Defendants retained the funds and the bonus amount, even though they were aware that these funds belong to Schick.

88.     Schick is informed and believes, and thereupon alleges, that Defendants have no genuine intent to deliver his funds to him.

Complaint

89.    As a result of Defendants' actions, they have effective taken Schick's money and made it their own, exercising dominion and control over his compensation.

90.    As a direct and proximate result of the Defendants' breaches, Schick has been injured in at least the amounts set forth above, subject to further evidence at trial.

## THIRD CAUSE OF ACTION
### (Common Count)

91.    The allegations of paragraphs 1 through 90 inclusive, are repled and realleged as though fully set forth herein.

92.    This is a cause of action for common count brought by Schick against Nanox Defendants.

93.    Beginning in April 2106 through the present, Schick has complied with his contractual obligations and performed services for the Defendants, at their request. Defendants agreed to pay Schick the value of those services received.

94.    The reasonable value of the services is $1,035,000 plus interest. The total balance of $1,035,000 plus interest is still due and owing.

95.    No payment of the outstanding balance of the deferred compensation has been paid, and there is now due, owing and unpaid from Defendants the sum of $1,035,000 plus interest from April 2016.

## FOURTH CAUSE OF ACTION
### (Fraud)

96.    The allegations of paragraphs 1 through 95, inclusive, are repled and realleged as though fully set forth herein.

97.    This is a cause of action for fraud against all Defendants, including Poliakine individually.

Complaint

98.     At all times relevant hereto, Poliakine was the CEO of Nanox Imaging Plc. and its successors in interest.

99.     On or about March 9, 2014, Poliakine sent an email to Schick which forwarded an email from Masuya Hitoshi with the subject line: "RE: Tests at GE." By and through sending that email, Poliakine, on behalf of Nanox Imaging Plc, misrepresented to Schick that the company was partnering with or at least seriously working with GE Medical.

100.    Schick is informed and believes, and thereupon alleges, that in fact GE Medical was not partnering with or seriously working with Nanox, which Poliakine knew. This implied a high level of interest from a serious industry company and higher likelihood of viability for the company.

101.    Schick is informed and believes, and thereupon alleges, that Poliakine was aware that serious business opportunities and advantages was an important consideration for Schick in determining to work for Nanox Imaging Plc. Schick is informed and believes, and thereupon alleges, that Poliakine nevertheless sent this email to create the false impression of the relationship with GE Medical, while concealing the truth that there was no real relationship or partnership with GE Medical.

102.    Schick did in fact rely on Poliakine's March 9, 2014 representations in determining to work with Nanox Imaging Plc.

103.    On or about March 17, 2014, Poliakine sent another email to Schick as part of inducing Schick to work with Nanox Imaging Plc. Among other things, Poliakine wrote: "As noted previously, I have spoken with Richard, Ariel and Moshe and everyone is very excited about having you on board. . . . FYI good news is that we have managed to secure $5M in funding."

104.    Schick is informed and believes, and thereupon alleges, that by March 17, 2014, Nanox Imaging Plc. had not in fact secured $5,000,000 in funding.

Complaint

22

105.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that Nanox Imaging Plc. had not secured $5,000,000 in funding when he sent the email on March 17, 2014 to Schick.

106.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that funding for the Nanox project was an important and material consideration for Schick in determining to work with the company. Schick is informed and believes, and thereupon alleges, that Poliakine nevertheless made this false representation with the intent to cause Schick to rely on this information and induce Schick to work for Nanox Imaging Plc.

107.   Schick did in fact rely on Poliakine's March 17, 2014 representation.

108.   Based upon and relying on the misrepresentations made on or about March 9 and March 17, 2014, Schick entered into the 2014 Agreement.

109.   Schick reasonably relied upon the representations above and was harmed as a result. But for these misrepresentations and concealments of material facts by Poliakine, Schick would not have entered into the 2014 Agreement and eventually the 2015 Agreement.

110.   In negotiating the 2015 Agreement, Nanox Imaging Plc. used multiple attorneys to draft the agreement on its behalf. Prior to entering into the 2015 Agreement, Nanox Imaging Plc.'s attorney, Michal Bineth Horowitz, sent the final draft to Schick for review. In his email on August 19, 2015, Horowitz stated: "Please find enclosed the consulting agreement after Mark's [another attorney for Nanox] comments (responding to your last draft). Benjy has calculated the number of shares constituting 5% as of May 1, 2014 and we inserted the number into the agreement. Please let us know if this draft is acceptable. I will send the final draft to review and approval of Nanox management before execution. Thanks Michal"

111.   This email falsely created the impression to Schick that it reflected substantially similar terms as had been previously discussed. However, the 2015 Agreement actually included new language that had never been presented to Schick

previously.  Based on Nanox Imaging Plc.'s attorneys' misrepresentation, Schick approved the 2015 Agreement.

112.   In March 2016, Poliakine approached Schick and asked if he would be willing to temporarily defer his compensation until the company had more financing because Nanox was having financial difficulty and this might give the company time to get its finances in order. On or about March 20, 2016, Poliakine sent an email to Schick with the subject "a couple of things." That email reads in part: "At some point I think you had mentioned that you want to put your Nanox payments on hold for a while given the financial situation. I don't know if that is something you want to implement or was just a thought. I am only asking because accounting reached out to me and I need to know if I need to take any action."

113.   In the days and weeks thereafter, Poliakine and Schick had multiple discussions in which Poliakine represented that the deferral of payment would be until the company had better financing, at which point Poliakine would be paid all money that was deferred. Poliakine and Schick also discussed that Schick would continue to work in the same position with the same responsibilities while the money is deferred.

114.   Schick is informed and believes, and thereupon alleges, that in March and April 2016, Poliakine did not in fact intend to simply defer payment to Schick but hoped to have his services while not paying for those services. Further, Schick is informed and believes,  and thereupon alleges, that on or around March 20, 2016, accounting had not reached out to Poliakine to solicit a deferral by Schick but instead Poliakine acted unilaterally to secure Schick's deferred payment plan.

115.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that Schick was sensitive of the financial condition of the company, which Poliakine hoped to use to the company's advantage. Schick is informed and believes,  and thereupon alleges that Poliakine misrepresented the request from

accounting and concealed the intention to obtain free services and not pay the deferred compensation to Schick.

116.   Schick is informed and believes, and thereupon alleges, that Poliakine was aware that the representation that the payment was only deferred and would be repaid was a material consideration for Schick. Schick is further informed and believes, and thereupon alleges, that Poliakine was aware that Schick desired to help the finance team if possible. Schick is informed and believes, and thereupon alleges, that Poliakine nevertheless made these false representations, namely, the intent to defer rather than not pay the compensation and the request by accounting, with the intent to cause Schick to rely on this information and induce Schick to defer compensation which continuing to perform services for the company.

117.   Schick did in fact rely on Poliakine's March 2016 representations and Schick continued to serve in the same role as a consultant to the company, but payments were delayed until the company was on better financial footing. Nevertheless, Defendants have not paid Schick any of his deferred monthly compensation since April 2016 through the present.

118.   Schick reasonably relied upon the representations above and was harmed as a result. But for Poliakine's misrepresentation and concealment, Schick would not have deferred his compensation.

119.   As a direct and proximate result of the Defendants' fraudulent actions by their CEO, Poliakine, Schick has been deprived of compensation in the amount of at least $900,000, plus legal interest, and the loss of compensation from his stock grant, in an amount to be proven at trial.

120.   Defendants actions were malicious and willful. Plaintiff is therefore entitled to also recover punitive damages.

Complaint

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

121.   The allegations of paragraphs 1 through 120 inclusive, are repled and realleged as though fully set forth herein.

122.   This is a cause of action for negligent misrepresentation by Schick against the Defendants.

123.   Poliakine, individually, and the Nanox Defendants, by and through their CEO, Poliakine, represented to Schick certain facts, set forth above, as being true. Specifically, in 2014, Defendants represented that the Nanox project was of high interest to GE Medical and that the company had received $5,000,000 in funding, to cause Schick to provide services to the company and engage with them. In 2016, Defendants represented that Schick's compensation would be deferred until additional funding was received by the company.

124.   Defendants' representations were not actually true.

125.   Even if Defendants may have believed that their representations were true, Defendants had no reasonable grounds for believing the representations were true when they were made.

126.   Defendants intended that Schick rely on these representations.

127.   Schick reasonably relied upon Defendants' representations.

128.   But for the representations above, Schick would not have engaged with the company, would not have provided services, and would not have agreed to defer his compensation when asked.

129.   As a direct and proximate result of Defendants' representation, Plaintiffs suffered injury and incurred damages of at least $900,000 plus interest, and the loss of compensation from his stock grant, in an exact amount to be proven at trial, in an amount to be proven at trial.

Complaint

## **SIXTH CAUSE OF ACTION**

### **(Intentional Misrepresentation)**

130.   The allegations of paragraphs 1 through 129, inclusive, are repled and realleged as though fully set forth herein.

131.   This is a cause of action for intentional misrepresentation by Schick against the Defendants.

132.   Poliakine, individually, and the Nanox Defendants, by and through their CEO, Poliakine, represented to Schick certain facts, set forth above, as being true. Specifically, in 2014, Defendants represented that the Nanox project was of high interest to GE Medical and that the company had received $5,000,000 in funding, to cause Schick to provide services to the company and engage with them. In 2016, Defendants represented that Schick's compensation would be deferred until additional funding was received by the company.

133.   Defendants' representations were not actually true. Defendants knew such representations were not true or intentionally withheld information from Schick.

134.   Defendants intended that Schick rely on these representations.

135.   Schick reasonably relied upon Defendants' representations.

136.   But for the representations above, Schick would not have engaged with the company, would not have provided services, and would not have agreed to defer his compensation when asked.

137.   As a direct and proximate result of Defendants' representation, Plaintiffs suffered injury and incurred damages of at least $900,000 plus interest, and the loss of compensation from his stock grant, in an exact amount to be proven at trial, in an amount to be proven at trial.

138.   Defendants' actions were malicious and willful. Plaintiff is therefore entitled to also recover punitive damages.

Complaint

## SEVENTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith & Fair Dealing)

139.   The allegations of paragraphs 1 through 138, inclusive, are repled and realleged as though fully set forth herein.

140.   This is a cause breach of the implied covenant of good faith and fair dealing by Schick against all the Defendants.

141.   Schick and Nanox Imaging Plc. entered into a written contract, namely, the 2014 Agreement and the 2015 Agreement. The rights and obligations in and under this contract were effectively acquired by Nano-X Imaging Ltd.

142.   Schick did all, or substantially all of the significant things that the 2015 Agreement required him to do, or he was excused from having to complete those things.

143.   All conditions required for Schick's performance under the 2015 Agreement occurred or were excused.

144.   Defendants, through Poliakine, requested that Schick defer his compensation until the company had sufficient funding. Defendants ultimately received sufficient funding but failed to compensate Schick for his deferred compensation.

145.   Defendants committed to provide Schick with the One Time Bonus. Schick qualified to receive this bonus but Defendants did not act in good faith to provide Schick with this bonus.

146.   Defendants, by failing to take the actions above, did not act fairly and in good faith.

147.   As a direct and proximate result of Defendants' representation, Plaintiffs suffered injury and incurred damages of at least $1,035,000 plus interest, and the loss of compensation from his stock grant, in an exact amount to be proven at trial, in an amount to be proven at trial.

Complaint

**WHEREFORE**, Plaintiff prays judgment as follows and demands judgment against Defendants, jointly and severally, for damages, interest, taxable costs and such other and further relief as this Court may deem just and proper, as follows:

1. For all damages directly and proximately caused by Defendants' breach of contract, according to proof, plus interest;

2. For all damages directly and proximately caused by Defendants' wrongful actions, according to proof, plus interest;

3. For punitive and exemplary damages according to proof;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court may deem just and proper.


DATED: October 28, 2021          WEEKS NELSON


                                 */s/ Gregory K. Nelson*
                                 Gregory K. Nelson
                                 Attorney for Plaintiff




## JURY DEMAND

Plaintiff hereby requests a jury in this matter.


DATED: October 28, 2021          WEEKS NELSON


                                 */s/ Gregory K. Nelson*
                                 Gregory K. Nelson
                                 Attorney for Plaintiff

Complaint